1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8
9  MARCUS W. MAGILL,                          CASE NO. 1:11-cv-01317-SMS

10                    Plaintiff,

11     v.                                      ORDER AFFIRMING AGENCY'S DENIAL OF
                                               BENEFITS AND ORDERING JUDGMENT FOR
12  MICHAEL J. ASTRUE,                         COMMISSIONER
    Commissioner of Social Security,
13
                      Defendant.
14
                                          /
15
16
17        Plaintiff Marcus W. Magill, by his attorney, Steven G. Rosales, seeks judicial review of a

18  final decision of the Commissioner of Social Security ("Commissioner") denying his application

19  for disability insurance benefits under Title II of the Social Security Act and for supplemental

20  security income under Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*). The matter

21  is currently before the Court on the parties' cross-briefs, which were submitted, without oral

22  argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1] Following a

23  review of the complete record and applicable law, this Court finds the decision of the

24  Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a

25  whole and based upon proper legal standards. Accordingly, this Court affirms the

26  Commissioner's determination.

27

28
   _____
   [1] Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 10 & 11).

I. **Procedural History**

On October 30, 2007, Plaintiff applied for disability insurance benefits under Title II of the Social Security Act. AR 35. On November 20, 2007, Plaintiff filed for supplemental security income. AR 6. In both applications, Plaintiff alleged disability beginning December 1, 2005. AR 94.

These claims were denied initially on September 29, 2008. AR 35. They were denied upon reconsideration on January 29, 2009. AR 57. Plaintiff requested a hearing on February 18, 2009. AR 76. The hearing occurred on April 29, 2010 before ALJ Sharon L. Madsen. AR 532-567. Plaintiff appeared and testified. *Id*. On May 21, 2010, the ALJ denied Plaintiff's application. AR 13-25. The Appeals Council denied review on May 19, 2011. AR 7-9. Plaintiff filed a complaint seeking this Court's review on August 9, 2011. Doc. 1.

II. **Factual Record**

A. **Plaintiff's Testimony**

At the time of the hearing, Plaintiff was 35 years old. AR 536-37. He had a high school education. AR 537. He was married to a disabled woman and had three daughters, aged 10, 7, and 5. *Id*. Plaintiff stated he had not used methamphetamines for three years or marijuana for one year. AR 554-55. He was last incarcerated in 2006. *Id*.

Plaintiff had worked numerous jobs, including as a floor salesman in an industrial and hardware area where he would cut glass, fix screens and chains, and answer questions about home improvement. AR 540-41. He had also worked as a line cook, a groundskeeper for a golf course, a delivery driver, a floor installer, and a landscaper. AR 542-45.

Plaintiff testified that his symptoms included back pain following surgery to his lower back. AR 546. He described weakness on his lower left side. AR 546. He had tingling sensations and numbness from his calves to his feet. AR 546. His back hurt while stooping and bending. AR 547-48. Sitting pinched his nerves, while standing or walking caused tension in his body. *Id*. He would need to lie down several times during the day for an hour to an hour-and-a-half total. AR 557. When putting on shoes and socks, he needed to stop halfway through and rest for "two minutes or so." AR 554. Sometimes he could not move and would lie down for 24 hours or more

1  if he could. AR 547. His medications helped with his pain, but they either made him drowsy or

2  kept him awake. AR 549.

3  He stated that he had asthma all his life. AR 550-552. He constantly battled bronchitis. *Id*.

4  A bronchitis attack could last for a month. *Id*. He had HIV, and this aggravated his asthma. *Id*.

5  The asthma attacks and bronchitis would sometimes inflame his lungs; in February he was

6  hospitalized for five days. *Id*. He had not smoked in a year. *Id*.

7  His HIV also caused diarrhea. *Id*. He would have diarrhea two or three days a week. AR

8  557-58. The diarrhea would send him to the bathroom from three to 20 times in a day, from eight

9  to 25 minutes each time. *Id*. Due to the diarrhea his weight was constantly fluctuating. AR 551-2.

10  Plaintiff had good and bad days with illness and fatigue. AR 539-40. He stated he could

11  lift 20 to 30 pounds comfortably, sit for 30 to 45 minutes on a good day and five on a bad day,

12  stand for an hour on a good day and not at all on a bad day, and walk about a mile on a good day.

13  AR 553-54. The longest he could perform an activity before needing to rest was "about a half

14  hour." AR 557. The resting would last one or two hours, but sometimes he would have to give up

15  altogether. AR 557. He could do the dishes and the laundry, cook dinners and breakfasts, shop,

16  do some yard work including mowing and a little weeding, and drive his kids to school. AR 538-

17  39. He spent some time on the computer but said it was hard to focus. AR 539-40.

18  **B.    Functional Reports**

19  Plaintiff also described his symptoms in a functional report dated February 28, 2007. AR

20  155-162. In the report, Plaintiff stated that his medical conditions affected his ability to squat,

21  bend, and kneel; his concentration and memory; his ability to get along with others; and his

22  ability to complete tasks. AR 160. He stated that he could only walk a couple of blocks before

23  needing to rest. *Id*. He would then rest for 45 minutes. *Id.* He could only pay attention for a

24  couple of minutes. *Id.*

25  His report also described his activities on a typical day. AR 155-162. He would perform

26  each of these tasks without assistance. *Id.* Each day he would prepare meals such as sandwiches

27  or TV dinners. Preparing food now took "twice as long" as it did before his ailments. He could

28  do laundry and cleaning; these tasks would also take "twice as long." He would go outside a few

times a day. He would go shopping for food or clothes, though these activities would take "twice as long." A few times a week he would visit his friends, or go to church, to NA meetings, or to medical appointments. He would travel on foot or bicycle. He stated that he was unable to play sports anymore: "I have gone into a depression and it's hard to be motivated to play sports anymore, energy level is below normal." AR 159. By contrast, before experiencing these conditions he could work long hours, play sports, and cook full dinners. AR 156.

On the same day, Plaintiff's mother Karen Magill submitted a third party functional report. AR 155-162. Ms. Magill's report largely mirrors Plaintiff's. She described how Plaintiff's medical condition affected his abilities: his asthma had worsened, he never completely healed from back surgery, he had problems with memory and concentration, and he could walk only a few blocks before resting. AR 152-3. She stated that, since his medical conditions began, his activities changed in that he now goes out less and "his energy level is way down." AR 151. She attributed this change in energy to pneumonia, pain, and depression. AR 154. Her description of Plaintiff's daily activities also resembled Plaintiff's description. She noted, as did Plaintiff, that certain activities took him twice as long to perform: doing laundry and housecleaning; shopping for food and running other errands; and preparing food. She also noted that a few times a week he would watch his three daughters. AR 148. He would feed them and help the oldest with her homework. *Id*. The only hobby or interest that she identified is "watching TV," which he would do "all day." AR 151.

### C.   Testimony of Vocational Expert

Thomas C. Dachelet testified as the vocational expert. He characterized Plaintiff's prior work as cook (medium, SVP5), forklift delivery driver (medium, 3), delivery driver (medium, 3), warehouse work (medium, 2), floor installer (medium/heavy/very heavy, 6), carpenter (medium, 7), groundskeeper (medium, 3), and hardware sales (light, 4).

For the first hypothetical question, the ALJ assumed a person of the same age, education, and work background as Plaintiff. The person could lift and carry 20 pounds occasionally and ten pounds frequently, and he could sit, stand or walk six hours in an eight-hour workday, with occasional stooping, crouching, crawling, and climbing. AR 563. He had asthma precautions of

4

avoiding concentrated dust, gases, and fumes. *Id.* Dachelet testified that such a person could perform Plaintiff's past work doing hardware sales.

For the second hypothetical question, the ALJ directed Dachelet to consider the individual described in hypothetical question 1, who in addition had a sit/stand option. Dachelet testified that such a person could not perform Plaintiff's prior work. Such a person could perform the requirements of representative occupations such as bagger (21,179 jobs in California), garment sorter (21,179 jobs in California), and grader (20,188 jobs in California). These jobs exist at nine times these numbers in the United States. AR 563-565.

The remaining hypotheticals started with the person in the second hypothetical. *Id.* In the third hypothetical, this person would need an additional two to four breaks a day of 30 minutes. *Id.* In the fourth, the person would need to miss two days a month due to illness. Id. In the fifth, the person would need restroom breaks at least three to four times during the day, stretching from eight to ten minutes each. *Id.* In each of these cases, the expert testified that the person would be disabled. *Id.*

### D.    Medical Record

The record showed that between 1993 and 2006, Plaintiff worked a multitude of jobs. AR 103-07, 139. Plaintiff's employment records indicate he did not sustain any job for longer than a year, and he typically worked a job for a few months at a time. *Id.*

**Spinal treatment.** Plaintiff has undergone surgery involving disc fusions in the lower back. AR 229. The date of the surgery is not apparent in the record. In September 2008, an x-ray showed good alignment of the vertebral bodies. The L4-5 vertebrae showed stable postsurgical changes.

Plaintiff received treatment from Mercy Medical Center Merced (Mercy) on October 27, 2008 for lower back pain. His pain level at discharge improved to a 3 out of 10 with 10 being the highest level of pain. AR 421-26. Plaintiff reported feeling stress from taking care of his three kids without his wife's help and that he "does everything at home." AR 511.

An MRI of the lumbar spine in December 2008 demonstrated no significant disc bulge, herniation or stenosis in the upper vertebrae, moderate facet degeneration at L3-4, and only

1  minimal scar status post L3-4 fusion. In February 2009, no large recurring disc bulge or

2  herniation was identified.

3      In April 2009, a neurosurgeon told the claimant that he did not need back surgery. AR

4  486. In May 2009, the claimant reported his back pain was doing better, with good pain control

5  since he had started taking Mobic in January 2009. AR 490, 484.

6      **HIV and Respiratory Issues.** Plaintiff was diagnosed with HIV in November 2006. AR

7  264. He began treatment for his HIV with Nicolas De La Pena, M.D. on December 4, 2006. AR

8  260. In January and February 2007, Plaintiff received treatment at Mercy. AR 224-49. He was

9  first admitted to Mercy on January 12, 2007 for three days. AR 246, 240. During his physical he

10  complained of a persistent cough and wheezing associated with fever and chills. AR 246. At

11  discharge he was diagnosed with bilateral pneumonia, chronic obstructive pulmonary disease

12  exacerbation, acquired immune deficiency syndrome with leukopenia, anxiety disorder, and

13  anemia. AR 240. Plaintiff was admitted again on January 31, complaining of persistent cough

14  with shortness of breath and fatigue on minimal exertion. AR 232. The diagnosis of pneumonia

15  was replaced with a diagnosis of either bronchitis or a lower respiratory tract infection, with his

16  symptoms exacerbated by his history of smoking. AR 225.

17      On March 10, 2007, Plaintiff presented to the Mercy emergency room for cough,

18  congestion, and wheezing. AR 287-88. He was alert, oriented, and in no acute distress; after

19  receiving medications Plaintiff was discharged in stable condition. *Id*.

20      Plaintiff complained of severe shortness of breath on May 30, 2007. AR 281-81. At the

21  time he was still smoking cigarettes, and he was given detailed educational information about

22  asthma exacerbation. *Id*. On November 6, 2007, Plaintiff's chest x-rays were negative without

23  active pulmonary disease, his heart size was normal, and his thoracic vertebrae were

24  unremarkable. AR 280.

25      Plaintiff received a CT scan of the abdomen and pelvis at Mercy on June 20, 2008. AR

26  393-94. The CT scan revealed that his lung bases were clear, his regional organs were

27  unremarkable, and his osseous, muscular, and vascular anatomy were unremarkable; the

28  physician's impression was a normal study. AR 393-94.

On December 1, 2008, Plaintiff's HIV was stable. AR 428. On December 11, 2008, Plaintiff checked into the emergency room at Mercy after being sick for two days when he had not been taking his medication. AR 441-42. He was discharged in stable condition. *Id.*

Plaintiff received treatment for a cough in November 2009. AR 477-80. At that time he claimed he had not smoked since January 2009. Id. By December 2009 his breathing was effortless and normal.

**Fatigue**. The medical record contains one report of fatigue. During the January 31, 2007 hospital visit which ultimately led to a diagnosis of bronchitis or a lower respiratory tract infection, Plaintiff's complaints included fatigue on minimal exertion. AR 232. Also, in February 2007, Plaintiff and his mother referred to fatigue in their functional reports. AR 147-154; AR 155-162. These same functional reports describe Plaintiff riding a bike, going to various social gatherings, and engaging in other activities. *Id*.

**Diarrhea.** The record does not contain evidence that Plaintiff complained of diarrhea in 2007. AR 227 (January); AR 147-154 155-162 (February); 287 (March); 284 (April); 281 (May); AR 277 (November). He did not complain of diarrhea in February 2008, but he complained of "frequent diarrhea" in late March 2008. AR 306. He described his diarrhea as "off and on" in April 2008. AR 362. In June 2008, he complained of abdominal pain, persistent nausea, and vomiting, but not of diarrhea. AR 357. He reported "frequent episodes of diarrhea" in July 2008. AR 200-201.

**Residual Functional Capacity Assessments.** Several medical consultants provided residual functional capacity assessments of Plaintiff. In March 25, 2008, Plaintiff saw internal medicine consultative examiner Dean Chiang, M.D. AR 306–09. Dr. Chiang reported that Plaintiff had a history of heavy drinking and drug use until 1994. *Id*. On physical examination, Dr. Chiang observed Plaintiff was able to get on and off the examination table with ease, and he opined Plaintiff had normal muscle bulk and tone. *Id*. He diagnosed Plaintiff with HIV/AIDS and asthma. *Id*. He opined Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; had no restrictions on sitting; could stand and/or walk 4 to 6 hours in an 8 hour workday, with no postural, manipulative, visual, communicative, or workplace environmental limitations; and did

not need any assistive device to ambulate. *Id*. However, the ALJ gave little weight to this opinion of functional ability. AR 21. The ALJ explained that additional limitations on exertion, posture, and work environment would be warranted in light of Plaintiff's back fusion surgery and asthma. *Id*.

The other agency medical consultants based their assessments on the case record, including opinions of the treating physician, examining medical opinions, and the claimant's allegations about his symptoms and limitations. AR 21. On May 19, 2008, state agency physician Alicia Blando, M.D., reviewed Plaintiff's record and opined Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; could sit, stand, or walk six out of eight hours; and could perform frequent postural movements. AR 319, 337-44. On June 17, 2008, state agency psychiatrist Harvey Biala, M.D., reviewed Plaintiff's record and opined that Plaintiff did not have a severe mental impairment. AR 328. He opined that his functioning was intact, he was able to engage in a wide variety of daily activities, and he was capable of performing light work. AR 331. On July 7, 2008, state agency physician G.W. Bugg, M.D., agreed that Plaintiff was capable of light work. AR 366. He opined that Plaintiff's asthma did not interfere with his general functioning and that there was no evidence that Plaintiff's HIV severely affected his constitution. AR 366. Dr. Bugg assessed Plaintiff's functional limitations to lifting or carrying 20 pounds occasionally and 10 pounds frequently, and to standing, walking, or sitting 6 hours in an 8-hour workday, with no postural, manipulative, visual, communicative, or environmental limitations. AR 372-76.

## III.   The ALJ's Decision.

The ALJ followed the five-step sequential process prescribed by the Commissioner for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). This process entailed answering the following five questions:

| | |
|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments |

1    meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

2    Step four:    Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

Step five:    Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 1, 2005. AR 18. Next, the ALJ identified Plaintiff's severe impairments: lumbar degenerative disc disease, status-post laminectomy L4-5, HIV, chronic obstructive pulmonary disease, and asthma (20 CFR §§ 404.1520(c) and 416.920(c)). AR 18. Third, the ALJ determined that these impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). AR 20. Before proceeding to step four, the ALJ determined Plaintiff's residual functional ability: he could "perform lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit, stand and/or walk 6 hours in an 8 hour workday, with a sit/stand option, occasionally crouch, crawl, and climb, and he must avoid concentrated exposure to dust, gases, and fumes." AR 20. The ALJ rejected any functional limitation due to depression or anxiety. AR 22. At step four, the ALJ determined that Plaintiff could not perform any past relevant work. AR 23. At step five, the ALJ determined that Plaintiff could perform the requirements of representative occupations such as bagger, garment sorter, and grader. AR 24. Accordingly, the ALJ concluded that plaintiff was not disabled. AR 25.

## IV.    Discussion

### A.    Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla" (*Richardson v.*

1  *Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance. *Sorenson v. Weinberger*, 514

2  F.2d 1112, 1119 n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might

3  accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole

4  must be considered, weighing both the evidence that supports and the evidence that detracts from

5  the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing

6  the evidence and making findings, the Commissioner must apply the proper legal standards. *See,*

7  *e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the ALJ's

8  determination that the claimant is not disabled if the ALJ applied the proper legal standards, and

9  if the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health*

10  *and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

11  **B.  Legal Standards**

12  To qualify for benefits, a claimant must establish that he or she is unable to engage in

13  substantial gainful activity because of a medically determinable physical or mental impairment

14  which has lasted or can be expected to last for a continuous period of not less than twelve

15  months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental

16  impairment of such severity that he or she is not only unable to do his or her previous work, but

17  cannot, considering age, education, and work experience, engage in any other substantial gainful

18  work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir.

19  1989).

20  The ALJ must follow the five-step sequential process prescribed by the Commissioner for

21  evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f); *Lester* at 828 n. 5.

22  As described above, the ALJ followed that procedure in this case.

23  **C.  Plaintiff's Claims**

24  Plaintiff contends that the ALJ committed legal error in determining Plaintiff's residual

25  functional capacity. According to Plaintiff, the ALJ improperly rejected evidence of Plaintiff's

26  limitations. This evidence consisted of Plaintiff's hearing testimony and a third-party function

27  report submitted by Plaintiff's mother, Karen Magill.

28  **1.  Ms. Magill's Third-Party Function Report**

10

1   When a claimant alleges symptoms that are not supported by medical evidence in the

2   record, the ALJ must give "full consideration" to testimony from third parties with knowledge of

3   these symptoms. SSR 88-13. When an ALJ rejects this third party testimony, the ALJ must give

4   reasons that are germane to each witness. *Valentine v. Comm'r Soc. Sec. Admin.,* 574 F.3d 685,

5   694 (9th Cir. 2009). In the hearing decision, the ALJ carefully considered the third-party adult

6   function report prepared by Ms. Magill:

7   I considered a third party function report submitted by Karen Magill, the claimant's
    mother, on February 28, 2007. She reported that the claimant is able to take care of his

8   personal grooming without any problem. She reported he is able to ride a bicycle, go
    shopping for groceries, do household chores such as laundry and cleaning, and prepares

9   simple meals daily. She reported that even with low energy, he watches TV, visits friends
    and goes to church a few times a week, and he is able to go places unaccompanied. Ms.

10  Magill reported the claimant has difficulty concentrating for very long and follows
    written instructions better than verbal ones. I give some weight to Ms. Magill'[s] report

11  because it is generally consistent with the record overall.

12  AR 21 (*citations to administrative exhibits omitted*).

13  Plaintiff objects to the ALJ's handling of Ms. Magill's function report. Referring to

14  testimony by Ms. Magill that Plaintiff "takes twice as long to perform those activities he

15  performs," Plaintiff's Opening Brief (Doc. 16) at 9, and to testimony by the vocational expert

16  that "such an individual would have no work available to them," *id.*, Plaintiff contends that the

17  ALJ erred because she rejected Ms. Magill's testimony without stating her reasons for doing so.

18  Plaintiff misreads the record. Neither Ms. Magill nor the vocational expert spoke of an

19  individual who "takes twice as long to perform those activities he performs." In describing the

20  activities that take Plaintiff twice as long to perform, Ms. Magill spoke only of laundry and

21  cleaning, shopping for food, and preparing food. AR 149-150. And the only limitations

22  considered by the vocational expert were an asthma restriction; a sit/stand option; an additional

23  two to four breaks a day of 30 minutes; missing two days a month due to illness; and restroom

24  breaks at least three to four times during the day, stretching from eight to ten minutes each. AR

25  563-565.

26  Plaintiff also misreads the ALJ's decision. The ALJ never "rejected" Ms. Magill's

27  statements. She gave "some weight" to her report. AR 21. She explicitly relied on her testimony

28  as evidence that Plaintiff "could perform a wide variety of daily activities." AR 22. The ALJ

based this decision on her finding that her report was "generally consistent with the record overall." AR 21. Indeed, Ms. Magill's report was largely consistent with a functional report submitted by Plaintiff himself. AR 155-162. Plaintiff's report corroborates her statements that he is able to engage in various activities without assistance, such as riding a bicycle; shopping for groceries; doing laundry and house cleaning; preparing simple meals; visiting friends; and going to church; NA meetings, and health appointments. *Id*. The ALJ never discredited these statements.

By giving "some weight" to Ms. Magill's statements, the ALJ implied that she might have discredited some portion of her report. In this instance, however, the ALJ need not have explained why or what portion. Generally, when an ALJ discounts testimony of lay witnesses as to a claimant's subjective symptoms, the ALJ must give reasons that are germane to each witness. *Valentine*, 574 F.3d at 694. However, the ALJ need not do so if the witness and Plaintiff give similar testimony and the ALJ provides adequate reasons for rejecting Plaintiff's testimony. *Id.* Here, Plaintiff and Ms. Magill gave substantially similar testimony as to Plaintiff's subjective symptoms. Ms. Magill's functional report closely tracked Plaintiff's own report, and Plaintiff described the same symptoms in his hearing testimony. The ALJ therefore only needed to provide adequate reasons for rejecting Plaintiff's testimony. As will be discussed next, the ALJ did so.

## 2.   Mr. Magill's Testimony

At the hearing, Plaintiff testified that his back pain, diarrhea, and fatigue were of a severity that required him to take frequent or lengthy breaks. The ALJ rejected this testimony as to the severity of these limitations. On appeal, Plaintiff contends that the ALJ improperly rejected his testimony as to the subjective symptoms, pain and fatigue. Plaintiff contends that in rejecting this testimony, the ALJ failed to comply with the second step of the analysis required under Social Security Ruling 96-7p. The Court finds that the ALJ committed no legal error.

In assessing the credibility of subjective symptom testimony, the ALJ must follow the two-step analysis described in SSR 96-7p. First, the claimant must produce objective medical

1  evidence of an underlying impairment(s) and show the impairment(s) "could reasonably be

2  expected to produce pain or other symptoms." *Batson v. Commissioner of Social Security,* 359

3  F.3d 1190, 1196 (2004), *quoting Smolen v. Chater,* 80 F.3d 1273, 1281–82 (9th Cir.1996). If the

4  first step is satisfied, the ALJ then evaluates the individual's symptoms to determine the extent to

5  which they "limit the individual's ability to do basic work activities." SSR 96–7p at *2. In

6  determining the credibility of the individual's statements, the ALJ must

7  
8  
9  
10  

> consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

11  *Id*. Credibility may also be judged through the claimant's reputation for truthfulness,

12  inconsistencies either in his testimony or between his testimony and his conduct, his daily

13  activities, and his work record. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). If

14  the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her

15  decisions. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

16      Plaintiff contends that "the ALJ decision is void of any sufficient rationale at all as to why

17  the ALJ ignored and disregard[ed] Mr. Magill's testimony." Plaintiff's Opening Brief (Doc. 16)

18  at 12. To the contrary, the ALJ provided specific reasons supporting her finding that Plaintiff was

19  not credible. The ALJ noted that Plaintiff's poor work history detracted from his credibility. AR

20  23. *See Thomas*, 278 F.3d at 959 ("the ALJ found that [the claimant] had an 'extremely poor

21  work history' and 'has shown little propensity to work in her lifetime,' which negatively affected

22  her credibility regarding her inability to work."). Similarly, the ALJ found that Plaintiff's history

23  of incarceration and drug abuse further detracted from his credibility. AR 23. *See Light*, 119 F.3d

24  at 792 ("An ALJ's finding that a claimant generally lacked credibility is a permissible basis to

25  reject excess pain testimony.").

26      The ALJ also based her finding on evidence that Plaintiff was engaging in activities

27  beyond the limitations that he was alleging. Substantial evidence supports this conclusion. As the

28

ALJ noted, "The claimant's extensive activities of daily living, including riding a bike, taking care of his 3 children, and doing yard work clearly refute the severe limitations the claimant alleges. In October 2008, he reported he does everything at home and that he has 3 kids and his wife (who he testified is disabled) was not helping him (Exhibit 36 F, page 40 [AR 511]). In addition, the claimant's mother reported that the claimant could perform a wide variety of daily activities as well (Exhibit 4E, pages 2-8 [AR 148-154])."

As a further problem with Plaintiff's credibility, the ALJ found that Plaintiff's "complaints of fatigue and diarrhea were not supported in the record." AR 23. In context, this finding refers to the "severity" of these alleged limitations. *Id*. The ALJ's conclusion is supported by substantial evidence. As to fatigue, the only medical record of this symptom is from February 2007, when Plaintiff was hospitalized with complaints of "persistent cough with shortness of breath and fatigue on minimal exertion." AR 232. He was diagnosed with bronchitis or a lower respiratory tract infection. AR 225. That same month, Plaintiff and his mother wrote function reports which also mentioned fatigue. AR 147-154; AR 155-162. Yet these reports, in the opinion of the ALJ, refuted Plaintiff's own assertions as to the extent of his fatigue. As the ALJ noted, they show "that the claimant could perform a wide variety of daily activities." AR 23. A Notice of Reconsideration dated January 29, 2009, which the ALJ also relied on, reached a similar conclusion. AR 71. This evidence of Plaintiff's abilities starkly contrasted with Plaintiff's testimony before the ALJ that, for example, when putting on shoes and socks, he needs to stop halfway through and rest for "two minutes or so." AR 554.

The ALJ found that Plaintiff's credibility was further undermined by the discrepancy between the severity of diarrhea that Plaintiff testified to in the hearing versus the severity supported by the record. At the hearing, Plaintiff described his diarrhea in potentially debilitating terms–occurring 2 or 3 days a week, and requiring him to use the bathroom between 3 to 20 times in a day, between 8 to 25 minutes each time. AR 557-58. While the record does show that Plaintiff has complained of diarrhea related to his HIV medications, it does not show diarrhea of such severity. The record shows that Plaintiff denied diarrhea through 2007 and until late March

2008, when he complained of "frequent diarrhea." In April 2008, he complained of abdominal pain for the last 3 years, and described his diarrhea as "off and on," without describing the frequency. AR 362. He did not complain of diarrhea in June 2008, at his endoscopy, at the same time as he complained of abdominal pain, persistent nausea, and vomiting. The following month, Plaintiff complained of "frequent episodes of diarrhea" in a report of contact with Social Security. AR 200-201. The record contains no other references to diarrhea. While the record shows that Plaintiff has had diarrhea, it also provides substantial evidence for the ALJ's conclusion that Plaintiff was not credible as to the severity of his diarrhea.

## V.   **Conclusion**

The ALJ's conclusions were supported by substantial credible evidence. Accordingly, this Court hereby AFFIRMS the agency's determination to deny Plaintiff disability benefits. The Clerk of Court is directed to enter judgment for Defendant Michael J. Astrue, Commissioner of Social Security.


IT IS SO ORDERED.

**Dated:    February 13, 2013                              /s/ Sandra M. Snyder**
                                                    UNITED STATES MAGISTRATE JUDGE